# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ONEIDA TRIBE OF INDIANS OF WISCONSIN,

        Plaintiff,

    v.                                      Case No. 06-C-1302

VILLAGE OF HOBART, WISCONSIN,

        Defendant.

---

## MEMORANDUM DECISION AND ORDER

---

At issue in this important case is the status of land located within the original boundaries of the Oneida Reservation that has been reacquired by the Oneida Tribe of Indians of Wisconsin ("the Tribe") several generations after title to the land lawfully passed to non-Indians. The Tribe filed this action against the Village of Hobart ("the Village") seeking a declaration that the Village has no authority to condemn its newly acquired property for a public roadway or to charge such property with the costs of public improvements in the form of a special assessment. The Tribe also seeks an injunction directing the Village to return to the Tribe the special assessments on its land that have already been paid. Though its complaint asserts ten separate counts against the Village, the Tribe's essential argument is that federal law recognizing tribal sovereignty and prohibiting the alienation of tribal lands prevents municipalities like the Village from exercising their statutory powers to condemn, and levy special assessments upon, reacquired tribal lands without the consent of the Tribe and/or Congress. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1362, and 1367(a).

In its answer, the Village denied that the Tribe was entitled to the relief it was seeking and asserted a counterclaim for declaratory relief confirming its authority to condemn the Tribe's newly acquired land for public roadways and to assess the property for the costs of improvements pursuant to state law. The case is presently before the Court on cross-motions for summary judgment. In addition to the briefs and arguments of the parties, the Court has also benefitted from the *amicus curiae* briefs filed by the Great Lakes Inter-Tribal Council ("GLITC") and a group of property owners, taxpayers and voting citizens of the Village of Hobart. Having considered fully the arguments set forth, I conclude that the Village is not barred from instituting condemnation proceedings and levying special assessments on the Tribe's reacquired lands in accordance with state law. Accordingly and for the reasons set forth below, the Tribe's motion will be denied, and the Village's motion will be granted.

## BACKGROUND

Although the dispute between the parties arises out of relatively recent land purchases by the Tribe and the Village's efforts to implement its current development plan, the resolution of that dispute requires consideration of the Tribe's history in Wisconsin and the various shifts in federal policy toward Indians over the nation's history that are reflected in the laws governing Indians and their lands. I therefore begin with that history.

### A. The Oneida Tribe and Federal Indian Policy

The Oneida Tribe of Indians of Wisconsin is a federally-recognized Indian tribe organized under the Indian Reorganization Act of 1934 ("IRA"), 48 Stat. 984 (1934), codified at 25 U.S.C.

2

§ 461 *et seq.* (Tribe's Proposed Findings of Fact (hereinafter "TPFOF") ¶ 2.) Its history, however, goes back much further. When European settlers first arrived on the North American continent, the Oneida Indians were one of the Six Iroquois Nations living in the area that later became New York. By the early 1800's, there was increasing pressure from the State of New York to move the Oneida west. In 1822-23, a small group of Oneidas known as the First Christian Party settled around the Fox River near Green Bay on land held by the Menominee Indians. A second group of Oneidas known as the Orchard Party settled in this area in 1830. The Menominee Indians ceded a portion of their land to the Oneidas in separate treaties in 1831 and 1832. Then, in 1938 the Oneida entered into a treaty with the United States in which they ceded to the United States their claims under their treaties with the Menominee Indians in return for a reservation area that consisted of 100 acres for each adult Oneida Indian then living in the Green Bay area. The Tribe's Reservation, established by the Treaty with the Oneida, Feb. 3, 1838, 7 Stat. 566, consisted of approximately 64,000 acres in what would later become parts of Brown and Outagamie Counties in the State of Wisconsin.[1] (Village's Proposed Findings of Fact (hereinafter "VPFOF") ¶¶ 4-7.)

The nation's official policy toward Indian tribes at this time proceeded from the premise that the "several Indian nations [constitute] distinct political communities, having territorial boundaries, within which their authority is exclusive . . . ." *Worcester v. Georgia*, 6 Pet. 515, 556-57 (1832). The Constitution granted Congress the authority both "[t]o regulate Commerce . . . with the Indian Tribes: and to make treaties, U.S. Const., Art. I, §8, cl. 3; Art. II, § 2, cl. 2, [and Congress] had determined by law and by treaty 'that all intercourse with [the tribes] would be carried on

---

[1] J. Campsi and L. Hauptman, <u>The Oneida Experience: Two Perspectives,</u> 65-72 (Syracuse Press 1988).

3

exclusively by the Federal Government.'" *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 257 (1992). It was thus well established that within the reservations, state and local jurisdiction would not lie. *Id.*

Federal policy toward Indians dramatically changed in the late 19th century, however, when Congress terminated the process of treaty-making with individual tribes, 25 U.S.C. § 71, and moved to a policy of allotment and assimilation. In 1887, Congress enacted the General Allotment Act, 25 U.S.C. § 331 *et seq.*, 24 Stat. 388, also known as the Dawes Act, the purpose of which was the eventual assimilation of the United States Indian population into the general population and the gradual elimination of Indian reservations.[2] Under the Dawes Act, the President was authorized to select Indian reservations for the allotment of land in severalty to the Indians residing on those reservations. The Dawes Act further provided that the Secretary of the Interior would issue initial patents for each allotment to the individual Indian allottee under which the United States would continue to hold the allotted land in trust for the benefit of the allottee for a period of 25 years. At the conclusion of the trust period, the United States was to issue another patent conveying the land to the allottee in fee simple. Section 5 of the Act provided that "at the expiration of said [trust] period the United States will convey [the allotted lands] by patent to said Indian . . . in fee, discharged of said trust and free of all charge or incumbrance whatsoever . . . ." 25 U.S.C. § 348.

The allotment process began on the Oneida Reservation in 1889, and by 1891, the final schedule of allotments was made with no surplus land remaining. (VPFOF ¶ 10.) In general, allotments of 90-acre parcels were made to heads of families; 45-acre parcels to individuals age 18

---

[2] *Cohen's Handbook of Federal Indian Law*, Matthew Bender (2005 ed.) (hereinafter "Cohen") at 74-77.

4

and older, and orphans under age 18; and 26-acre parcels to minors with surviving parents. The Secretary approved the allotments, and the initial trust patents were issued to 1,520 allottees on June 13, 1892. This is not to say, however, that all land within the Reservation was allotted. Approximately 120 acres over which Congress had previously granted a now-abandoned railroad easement was not allotted; nor was another tract of approximately 40 acres that was used as an Episcopalian mission to the Oneidas. (Aff. of James W. Oberly, ¶ 21.)

In 1906, Congress amended the General Allotment Act through the Burke Act, 34 Stat. 182, 25 U.S.C. § 349, which authorized the Secretary of the Interior to immediately issue fee patents to competent Indian allottees without waiting the entire twenty-five years required under the Dawes Act. Section 6 of the Burke Act explicitly provided that upon issuance of the patent conveying the allotment in fee simple, "all restrictions as to sale, incumbrance, or taxation of said land [would] be removed." 25 U.S.C. § 349. During the same session, Congress also enacted a specific provision authorizing the issuance of fee patents to allotted lands on the Oneida Reservation. This provision explicitly provided that "the issuance of such patent shall operate as a removal of all restrictions as to the sale, taxation and alienation of the lands so patented." 34 Stat. 325 ch. 3504 (hereinafter the "Oneida Provision").

In apparent response to the allotment process, the Wisconsin legislature enacted 1903 Wis. Laws ch. 339, which created two new towns within the Oneida Reservation boundaries: the Town of Hobart and the Town of Oneida. The Town of Hobart included "all that part of the territory embraced within the Oneida reservation situated in Brown County," which consisted of approximately 40% of the reservation. The Town of Oneida was comprised of the remaining portion of the reservation situated in Outagamie County.

5

Over the years that followed, fee patents were issued for the vast majority of allotted land on the Oneida Reservation and most of that land, including all of the land at issue here, fell out of Indian ownership. (TPFOF ¶ 8; VPFOF ¶¶ 16, 38, 59.) There were essentially four ways in which fee land passed from Indian ownership during this period of time. First, beginning in 1902, the Secretary of the Interior and the Commissioner of Indian Affairs, pursuant to a new act of Congress, the Act of May 27, 1902, ch. 888, §7, 32 Stat. 245, authorized the sale of allotments of deceased tribal members for the benefit of their estates. Second, some Oneida Indians sold their parcels, or portions thereof, for cash on the open market. Third, some Indians mortgaged their property and then, when they failed to repay their loans, lost their land in foreclosure. Finally, some tribal members did not pay their property taxes and the town government eventually executed on the resulting tax lien. (TPFOF ¶ 9.)

In 1934, Congress once again drastically changed federal policy toward Indian tribes when it turned away from allotment and assimilation through the passage of the Indian Reorganization Act (IRA), 25 U.S.C. §§ 450 *et seq.* The purpose of the IRA was to stop the loss of Indian lands through the allotment process and re-establish tribal governments and land holdings. Among other steps taken to achieve these goals, the IRA terminated the further allotment of reservation lands, extended unexpired trust periods on allotted lands, and empowered the Secretary of the Interior to acquire lands to be placed into trust status and thus exempt from state and local taxation. 25 U.S.C. §§ 463, 465. The IRA also "permitted tribes to organize and adopt constitutions with a congressional sanction of self-government, and it permitted tribes to form business committees or business corporations."[3] 25 U.S.C. § 476.

_____

[3] *Cohen* at 84-87.

In 1936, within two years of passage of the IRA, the Tribe adopted its Constitution and By-Laws. Since that time, the Tribe has continuously governed itself and its members first through its General Tribal Council and then, since amendment of its Constitution and By-Laws in 1967, through its Business Committee acting pursuant to delegated authority. (TPFOF ¶ 5.) Although the passage of the IRA stopped the further loss of tribal lands, it did not reverse the loss of reservation land that had already occurred. As of 1941, according to the Tribe's Division of Land Management, 1,694 acres of Reservation land were held in trust for the Tribe, another 713 acres were held in trust for individual tribal members, and 2,308 acres were owned by tribal members in fee. These three categories comprised approximately 7% of the total land within the reservation. (TPFOF ¶ 15.) At that time, the primary use of the land was agricultural. As the population of Green Bay and the surrounding municipalities continued to grow in the years that followed, residential and commercial development in the Town of Hobart increased as well. (TPFOF ¶ 16; VPFOF ¶ 34.) Approximately 5000 acres of the Town of Hobart were annexed by the neighboring municipalities of Green Bay, Ashwaubenon and Howard. (VPFOF ¶ 15.)

**B. The Tribe's Land Re-Acquisitions and the Current Dispute**

Over the last three decades, especially after the passage of the Indian Gaming Regulatory Act in 1988, the Tribe's economic standing in northeast Wisconsin has increased dramatically. Today, the Tribe has a budget of over $527 million, with which it funds and operates numerous tribal governmental departments and programs that provide essential services for members of the Tribe, residents and visitors. (TPFOF ¶¶ 19, 20.) One of the Tribe's long-term goals is "the

7

purchase and recovery of all original reservation lands."[4]  Village assessment records show that in

2007, the total area in the Village was approximately 21,195 acres, of which there were 1,034 acres

of tribal land held in trust, and 5,770 acres of tribal fee land.  (VPFOF ¶ 26.)

In the meantime, the Town of Hobart, which after incorporation on May 13, 2002, became

the Village, has continued to exercise the authority granted it under Wisconsin law to carry out its

functions.  The Town's 1974 comprehensive land use plan included a proposal for a 170 acre

industrial park in the southeast part of the Town.  (VPFOF ¶ 40; Aff. of Joseph Helfenberger, Ex.

D.)  In 1984, the Town designated approximately 490 acres of land for such use.  Efforts to

implement the plan began in earnest in 1995.  To encourage  development of the area, the Town

authorized the expenditure of approximately $5 million to provide sewer, water, gas, roads and other

improvements.  As part of the Southeast Industrial Park development, construction of an extension

of O'Hare Boulevard to serve as the main east-west thoroughfare for the Park was authorized.  In

May of 2001, bonds were authorized for the O'Hare Boulevard extension, and on June 26, 2001,

the Town Board met and adopted an order laying out the extension as a town highway, awarding

damages for the right-of-way acquisition, and establishing the levy for the special assessments.

(VPFOF ¶¶ 42-45.)

At the same time that the Village was moving forward on its plan for an industrial park,

however, the Tribe was buying up the land where it was to be located.  In fact, on the same day that

the Village adopted an order laying out the extension of O'Hare Boulevard, the Tribe purchased 274

acres of land in the proposed industrial park, which, together with the 98-acre purchase the Tribe

had made in 2000, resulted in tribal ownership of more than 75% of the 490-acre site.  (VPFOF ¶

---

[4] *See* Tribal website at http://www.oneidanation.org/?page_id=24.

8

46-47.) The Village neither sought nor obtained the Tribe's approval for the O'Hare Boulevard Project, and the Tribe objected to the project and informed the Village of its objection. (TPFOF ¶ 13.) When the Village nevertheless indicated its intent to follow through with the project, the Tribe advised the Village of its position that state law authorizing condemnation for highway purposes "does not apply to land owned by a tribal government." (VPFOF ¶ 49.)

Notwithstanding the Tribe's position that its land is not subject to state law authorizing the Village to condemn land for highway purposes and specially assess the abutting land for the cost of improvements, the Tribe has paid $1,021,318 in special assessments for the O'Hare Boulevard Project since 2001. (TPFOF ¶ 15.) The Tribe has not paid the special assessment for 2006, but has continuously made property tax payments on the O'Hare Boulevard parcels. (VPFOF ¶¶ 55-56.) In light of the Tribe's claim that its land was exempt from state law authorizing the Village to condemn private property for public roadways, however, the Village elected not to proceed immediately with the project and, instead, on January 20, 2003, filed an action for declaratory relief in state court to resolve the jurisdictional dispute. When the Tribe's motion to dismiss the state court action was denied, the suit was stayed so the parties could attempt settlement.

On November 3, 2006, while the state court action was still pending, the Tribe purchased an additional 17-acre parcel (the "Forest Road Property"), as well as a right of first refusal and a conservation easement on the adjacent land, in another area of the Village that was slated for development. (TPFOF ¶ 17.) The Village had granted plat approval to the previous owner of this property to develop a subdivision. (VPFOF ¶¶ 61-62.) After its purchase, however, the Tribe notified the Village that it did not intend to develop the property as planned by the previous owner and would oppose any infrastructure projects on its Forest Road Property. (TPFOF ¶ 18.) On

9

November 26, 2006, the Village Board voted to authorize the initiation of condemnation proceedings for a portion of the Tribe's Forest Road property south of the Highway 29-32 right-of-way for the placement of a frontage road and utility services. (VPFOF ¶ 66.) Shortly thereafter, the Tribe commenced this action and the Village voluntarily dismissed its state court action.

The Tribe now moves for summary judgment, claiming that its inherent sovereignty; Section 16 of the IRA, 25 U.S.C. § 476(e); and the Indian Nonintercourse Act ("INA"), 25 U.S.C. § 177, preclude the Village from condemning the Tribe's fee property without its consent. The Tribe further contends that its fee land within its reservation boundaries is exempt from the special assessment imposed by the Village and seeks return of that portion of the assessment it previously paid. The Village, in its cross-motion for summary judgment, claims that land held in fee by the Tribe and located within the village boundaries is subject to the Village's condemnation and taxation authority.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id*. at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some

10

factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

In this case, the parties are in dispute over many of the underlying facts. They disagree, for example, over precisely how soon after allotment title to the vast majority of reservation land was lost to tribal members, the percentage of the Tribe's population that continued to live on reservation lands after the allotment era, the degree to which both the Tribe and the Town/Village exercised governmental functions prior to the 1970's, and even the motivations that underlie their respective actions. I need not resolve these disputes, however, because they are not material to the legal issue raised by the parties. That issue is whether land within the original boundaries of the Oneida reservation, which was conveyed by the United States to individual tribal members in fee simple, then transferred to third parties, and finally reacquired by the Tribe, is subject to the Village's authority under state law to condemn private land for public roadways and to charge against such land the costs of improvements made in connection therewith. This is a narrow question of law that I conclude the United States Supreme Court has already implicitly decided.

## B. Tribal Sovereignty and the Effect of the Allotment Acts

Indian tribes have inherent powers of a limited sovereignty which have never been extinguished. *United States v. Wheeler*, 435 U.S. 313, 322 (1978). One of the hallmarks of Indian sovereignty is "the power to exclude non-Indians from Indian lands . . . ." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982). However, tribal sovereignty, in all its aspects, is "subject

11

to plenary federal control and definition." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold*, 476 U.S. 877, 891 (1986). This plenary federal control is exercised through Congress pursuant to Article I, section 8 of the Constitution, which explicitly grants to the legislative branch the power "to regulate commerce . . . with the Indian tribes." Thus, while the Tribe distinguishes its claims based on its sovereignty from those based on federal law in its complaint, the two are inextricably linked. To the extent Congress has removed restrictions intended to protect tribal lands, tribal sovereignty over those lands has also been removed.

The Village argues that pursuant to its constitutional authority, Congress removed all federal restrictions on the alienation of the land at issue in this case through its passage of the Dawes Act, the Burke Act, and the Oneida Provision (collectively referred to herein as the "Allotment Acts"). Indeed, in addition to the Allotment Acts which provided for the removal of "all restrictions as to sale, incumbrance, or taxation of said land" upon issuance of a patent, 25 U.S.C. § 349, the Village notes that Congress also enacted during the allotment period another statute that specifically addressed the question of condemnation of allotted lands. In the Act of March 3, 1901, ch. 832, § 3, 31 Stat. 1084 (the "1901 Act"), Congress provided that "[l]ands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned." 25 U.S.C. § 357. While Congress later put an end to the policy of allotment with its enactment of the IRA, the Village contends that it did not reactivate the federal restrictions on alienation it previously removed on lands that had already been allotted and transferred in fee. Instead, Congress established a procedure which would permit the orderly return of reservation lands to protected status by the Secretary of the Interior upon

12

consideration of the interests of all concerned. *See* 25 U.S.C. § 465.[5] It thus follows, according to the Village, that the land at issue here is not federally protected and Wisconsin's laws authorizing municipalities to condemn property within their boundaries, Wis. Stat. § 61.36, and to charge such property with the costs of improvements that specially benefit such land, Wis. Stat. § 66.0703, are fully applicable.

The Village's understanding of the purpose and effect of the Allotment Acts and the IRA finds strong support in the Supreme Court's decisions in *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251 (1992), *Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103 (1998), and *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197 (2005). In *Yakima*, the Court rejected the argument, almost identical to the Tribe's here, that a county could not impose an *ad valorem* property tax on reservation land within its boundaries that was held in fee by a tribe or tribal members. As in this case, the property at issue, though located within the original boundaries of the Yakima Reservation, was no longer held in trust for the benefit of the Tribe by the United States. It was owned in fee by Indians and non-Indians as a result of patents distributed during the allotment era. When the County proceeded to foreclose on parcels for which the taxes had not been paid, including parcels in which the Yakima Tribe or its members had an interest, the Tribe commenced an action for declaratory and injunctive relief, contending that federal law prohibited the County from imposing taxes on fee-patented lands held by the Tribe or its members. 502 U.S. at 286. In support of its position, the Yakima Tribe argued that by terminating the allotment program and restoring tribal integrity through the IRA, Congress

---

[5] Although the Tribe has applied to the Secretary of the Interior pursuant to § 465 to restore federal trust status to the newly acquired property in question, its application has not yet been acted upon.

had implicitly repealed the authority to tax such property, which had been explicitly granted in § 6 of the Burke Act, and "returned the law to its pre-General Allotment Act foundations." *Id.* at 260.

The Supreme Court, however, rejected the Tribe's argument that § 6 of the Burke Act had been repealed by implication, noting "the cardinal rule . . . that repeals by implication are not favored." *Id.* at 262. The Court also observed that the Yakima Tribe's view rested on a misunderstanding of the Court's previous decisions and a mistaken perception of the structure of the General Allotment Act. *Id.* The effect of the General Allotment Act, the Court explained, reaffirmed by the Burke Act, was to remove from allotted lands all restrictions as to sale, incumbrance, or taxation upon issuance of a patent. *Id.* at 264. This had been clear for as far back as *Goudy v. Meath*, 203 U.S. 146 (1906), which had rejected the argument that in granting Indians the right to convey their land, Congress had not also made such lands subject to taxation and forced sale. *Goudy* had held that although it was certainly possible for Congress to "grant the power of voluntary sale, while withholding the land from taxation or forced alienation," such an intent would not be presumed unless it was "clearly manifested." *Id.* at 149. *Goudy* found no such manifestation of intent in the General Allotment Act. Thus, in *Yakima*, the Court observed that "when § 5 [of the General Allotment Act] rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes." 502 U.S. at 263-64. The *Yakima* Court went on to note that § 6 of the Burke Act, which removed "all restrictions as to sale, incumbrance, or taxation," 25 U.S.C. § 349, "made this implication of § 5 explicit, and its nature more clear." 502 U.S. at 264.

In so ruling, the *Yakima* Court acknowledged that Congress put an end to further allotment of reservation land in 1934 with the enactment of the IRA. But in doing so, the Court held,

14

Congress "chose *not* to return allotted land to pre-General Allotment Act status . . . ." *Id.* (italics original). Instead, Congress left such land "freely alienable by the allottees, their heirs, and assigns, . . . and chose not to terminate state taxation upon those lands as well." *Id.* The Court thus concluded that Congress had authorized state taxation of the Yakima Tribe's fee lands and explicitly rejected the Tribe's further argument that the Court was required to balance the County's interests with those of the Tribe to determine whether property taxes could be lawfully imposed. "Either Congress intended to pre-empt the state taxing authority or it did not. Balancing of interests is not the appropriate gauge for determining validity since it is that very balancing which we have reserved to Congress." *Id.* at 267 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 177, 100 S.Ct. 2069, 2093, 65 L.Ed.2d 10 (1980) (opinion of Rehnquist, J.)).[6]

*Yakima*'s central holding that fee-patented land located within the original boundaries of a reservation was taxable, even if reacquired by the Tribe, was reaffirmed six years later in *Cass County v. Leech Lake Band of Chippewa Indians*. In *Cass County*, the United States Court of Appeals for the Eighth Circuit had held that several parcels of reservation land held by the Leech Lake Band of Chippewa Indians were not subject to local property taxes because the provisions of the Nelson Act of 1889, 25 Stat. 642, under which they were sold did not incorporate the General Allotment Act or include any mention of an intent to tax such land if it was later reacquired by the Band in fee. 524 U.S. at 110. By failing to incorporate the provisions of the General Allotment Act or otherwise specify its intent, a divided panel of the court reasoned, Congress had failed to make

---

[6] The *Yakima* Court did hold, however, that the County's excise tax on sales of such land could not stand since it was not a tax upon the land, but rather "a tax upon the Indian's activity of selling the land . . . ." 502 U.S. at 269. The Court concluded that the excise tax violated *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463 (1976), which had struck down state cigarette and personal property taxes on reservation Indian residents.

"unmistakably clear" clear its intent to subject such lands to state or local taxation as *Yakima* and the Court's previous decisions required.  *Id.* at 109.  The lower court thus concluded that the parcels reacquired by the Band could not be taxed.  *Id.* at 110.

On *certiorari* review, however, the Supreme Court held that the Eighth Circuit had misread its decision in *Yakima* and reversed.  While the Court acknowledged that it had in the past consistently declined to find that Congress had authorized state or local taxation of reservation land unless Congress had "made its intention to do so unmistakably clear," *id.*, it noted that *Goudy* and *Yakima* established a different test for determining whether reservation lands allotted in fee to individual Indians were subject to state or local taxation.  Under *Goudy* and *Yakima*, the test for determining whether reservation lands allotted in fee were subject to state or local taxation was not whether Congress had made its intent to subject them to taxation unmistakably clear, but whether Congress had made its intent that the land not be subject to taxation clearly manifest.  This followed from *Goudy*'s holding that the mere fact that the lands had been made freely alienable meant that Congress had intended they be subject to taxation and forced sale, unless a contrary intent was "clearly manifest."  *Cass County*, 524 U.S. at 112 (citing *Goudy*, 203 U.S. at 149).  Although the *Yakima* Court had found explicit the intent to permit taxation of reservation fee lands in § 6 of the Burke Act, it had also "indicated that the alienability of allotted lands itself, as provided by § 5 of the [General Allotment Act], similarly manifested an unmistakably clear intent to allow taxation." 524 U.S. at 112.  *Yakima* had thus concluded that the land at issue there was subject to local taxation without regard to the explicit authorization set forth in the Burke Act.  In *Cass County*, the Court found the principles established in *Goudy* and *Yakima* dispositive.  Having rendered the land freely alienable through issuance of a fee patent, and having failed to clearly manifest the intent that it not

16

be subject to taxation, Congress had made unmistakably clear its intent that the land be subject to state and local taxation. *Id.* at 113.

*Cass County* also reaffirmed *Yakima*'s holding that "once Congress has demonstrated (as it has here) a clear intent to subject the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it nontaxable." 524 U.S. at 114 (citing *Yakima*, 502 U.S. at 263). The mere repurchase of the land by the Tribe was not enough to place the land back under federal protection and exempt it from state or local property taxes. 524 U.S. at 114. To hold otherwise, the Court observed, would render § 465 of the IRA, which specifically authorized the Secretary of the Interior to place land in trust to be held by the Federal Government for the benefit of the Indians and thus exempt from state and local taxation, partially superfluous. *Id.* The Court thus concluded that the parcels at issue remained taxable "unless and until they were restored to federal trust protection under § 465." *Id.* at 115; see 25 U.S.C. § 465.

This last point – that a tribe cannot unilaterally reinstate federal protection of its reservation lands simply by making open-market purchases from current titleholders – received additional support from the Court's 2005 decision in *City of Sherrill v. Oneida Indian Nation of N.Y.* In *Sherrill,* the Court held that § 465 of the IRA provided the exclusive mechanism for restoring federal protection from local property taxes for reservation lands reacquired by the Oneida Indian Nation of New York (OIN), even if the lands had not been lawfully conveyed in the first place. *Sherrill* concerned the taxation of lands reacquired by the OIN some two hundred years after they had been conveyed to the State of New York. Unlike the land at issue in *Yakima* and *Cass County*, however, Congress had never removed federal protection from the land at issue in *Sherrill* and consented to its transfer. The State of New York had obtained title to the land in violation of federal

17

law. 544 U.S. at 204-05. The Court nevertheless held in *Sherrill* that the "long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties" precluded OIN's claim that the reservation land it recently reacquired was now exempt from local taxation. *Id.* at 216-17. In so ruling, the Court explicitly rejected the "unification theory," offered by the OIN with the support of the government, under which fee and aboriginal title became unified with the OIN's purchase of the property so that the OIN could now assert sovereign dominion over the parcels. "We now reject the unification theory of OIN and the United States and hold that 'standards of federal Indian law and federal equity practice' preclude the Tribe from rekindling embers of sovereignty that long ago grew cold." *Id.* at 214. Instead, the Court held, § 465 of the IRA provided the "proper avenue" for the OIN to reestablish sovereign authority over territory it had last held 200 years ago:

> The regulations implementing § 465 are sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory. Before approving an acquisition, the Secretary must consider, among other things, the tribe's need for additional land; "[t]he purposes for which the land will be used"; "the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls"; and "[j]urisdictional problems and potential conflicts of land use which may arise."

*Id.* at 220-21 (quoting 25 CFR § 151.10(f) (2004)). The Court thus rejected the OIN's claim that its newly acquired property was exempt from "the regulatory authority" of the City. *Id.* at 202.

The Tribe argues that none of the foregoing cases controls the outcome here. It first distinguishes *Yakima* and *Cass County* on the ground that those cases involved only the authority to assess property taxes on fee-patented land within the reservation boundaries. Neither addressed the power to condemn such property which is the issue in this case. While the Tribe strongly

18

disagrees with the result reached in *Yakima* and *Cass County*, it argues that nothing said by the Court in those cases governs the precise issue presented here. Indeed, in the Tribe's view, the Court in *Yakima* "refused to recognize state in rem jurisdiction over fee-patented allotments beyond the taxation of . . . land." (Pl. Br. Resp. at 23.) *Sherrill*, according to the Tribe, provides even less support for the Village since it was based on the finding that the OIN had delayed asserting its jurisdictional rights within the reservation for 200 years. In *Sherrill*, the Court had held that the tribe's inaction on its long-dormant jurisdictional claim rendered the claim equitably unenforceable. (Pl.'s Br. Resp. at 2.) In this case, by contrast, the Tribe contends that its claim only ripened in 2001 when the Village first threatened to condemn the Tribe's property, and then again in 2006 when it adopted plans for an additional project. Also in contrast to the OIN in *Sherrill*, the Tribe contends that it has maintained a continuous presence on its reservation since it arrived in the area in the 1820s. Thus, the Tribe argues that the equitable considerations that the Court found determinative in *Sherrill* simply do not exist here. At most, there are disputed issues of fact the resolution of which must await a more complete development of the record before it can be determined whether *Sherrill* applies. Finally, the Tribe notes that notwithstanding the Supreme Court's holding that the City of Sherrill could lawfully impose *ad valorem* taxes on the OIN's reacquired lands, the district court held on remand that the taxing authorities were barred from foreclosing on the OIN's land for nonpayment of the taxes. *See Oneida Indian Nation v. Oneida County*, 432 F. Supp. 2d 285 (N.D.N.Y. 2006); and *Oneida Indian Nation v. Madison County*, 401 F. Supp. 2d 219 (N.D.N.Y. 2005) (appeals pending). Thus, in the Tribe's view, even if the facts in this case were the same as *Sherrill*, the outcome in that case does not support the Village's contention that it has authority to condemn the Tribe's land.

19

The Tribe's narrow reading of the *Yakima, Cass County,* and *Sherrill* does not withstand analysis. *Yakima* and *Cass County* make clear that once Congress withdraws federal protection from the Tribe's reservation lands, as it did in enacting the Allotment Acts, all restrictions on taxation and alienation of such lands are removed. In this respect, they are consistent with a long line of Supreme Court cases with similar holdings. *See South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 508 (1986) ("We have long recognized that, when Congress removes restraints on alienation by Indians, state laws are fully applicable to subsequent claims."); *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 676 (1974) ("Once patent issues, the incidents of ownership are, for the most part, matters of local property law to be vindicated in local courts . . ."); *Larkin v. Paugh*, 276 U.S. 431, 439 (1928) ("With the issue of the patent, the title not only passed from the United States, but the prior trust and the incidental restriction against alienation were terminated. . . . thereafter all questions pertaining to the title were subject to examination and determination by the [state] courts . . . ."); *Dickson v. Luck Land Co.*, 242 U.S. 371, 375 (1917) ("With those restrictions entirely removed and the fee-simple patent issued, it would seem that the situation was one in which all questions pertaining to the disposal of the lands naturally would fall within the scope and operation of the laws of the state.").

But *Yakima* and *Cass County* also make clear that the IRA did not restore federal protection to land that had already been distributed in fee, and further, together with *Sherrill*, they make clear that federal protection can not be restored merely upon purchase of such lands by the Tribe.[7] While

---

[7] The Tribe's effort to distinguish *Sherrill* on the ground that the equitable considerations that the Court found sufficient in that case to preclude relief are not present here misses the point. *Sherrill* confirms the principle that once the protections attached to Indian lands are removed, a tribe "cannot regain them through open-market purchases from current titleholders." 544 U.S. at 203. In *Sherrill*, the Court held that this principle applies, even when the original conveyance of the

it is true that all three cases directly addressed only exemption from taxation, the Court's analysis in *Yakima*, reaffirmed in *Cass County*, clearly encompasses the forced alienation of such lands through sale for unpaid taxes. *See Yakima*, 502 U.S. at 263-64 ("Thus, when § 5 [of the General Allotment Act] rendered the allotted lands alienable and encumberable, it also rendered them subject to assessment and forced sale for taxes."). The *Yakima* Court even recalled Chief Justice Marshall's hyperbolic observation that "the power to tax involves the power to destroy." *Id.* at 258 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 431 (1819)). Yet, the Court still concluded that the Yakima Tribe's fee-patented land was not exempt from the County's *ad valorem* property tax.

The suggestion that only federal protection against property tax assessments was withdrawn, but not protection from other, similar assessments, or from forced alienation by way of condemnation or foreclosure for nonpayment of taxes, has no basis in logic or law.[8] Land is either exempt from state law, or it is not. To paraphrase *Goudy*, that Congress may grant the power of taxation while withholding the land from foreclosure for nonpayment of such taxes may be conceded. But while Congress may make such provision, its intent to do so must be clearly

---

tribe's lands to non-Indians was unlawful, if the passage of time and changes in circumstances give rise to equitable concerns that preclude relief. Where, as here, the special protection the Tribe's land previously enjoyed was lost as a result of lawful transactions, there is no need to rely on the equitable considerations that the Court found sufficient to preclude relief in *Sherrill*. The exemptions the Tribe claims for its lands in this case were removed by law, and while the parties vigorously dispute whether the same equitable concerns that underlay *Sherrill* are present here, ultimately, it does not matter. The land's exemptions having been lawfully removed, the Village need not rely upon equity to prevent the Tribe from asserting them.

[8] The Tribe offers no meaningful distinction between the property tax assessments at issue in *Yakima*, *Cass County* and *Sherrill* and the special assessment at issue here. A special assessment is in the nature of a tax, but differs from a general tax in that it is imposed to pay for an improvement which benefits a specific property within the political division imposing it. *City of De Pere v. Public Service Comm'n*, 63 N.W.2d 764, 769 (Wis. 1954).

manifested, for it hardly makes sense to permit taxation while at the same time prohibiting the only means of collecting such taxes. 203 U.S. at 149. Given the immunity from suit that Indian tribes enjoy, *see Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991), no other means of recovery for unpaid property taxes exists. Unless a state or local government is able to foreclose on Indian property for nonpayment of taxes, the authority to tax such property is meaningless, and the Court's analysis in *Yakima*, *Cass County* and *Sherrill* amounts to nothing more than an elaborate academic parlor game. Since it hardly seems likely that the Court was simply playing a game in those cases, I conclude, contrary to the district court in the *Oneida Indian Nation* cases on remand from *Sherrill*, that implicit in the Court's holding that Indian fee lands are subject to *ad valorem* property taxes is the further holding that such lands can be forcibly sold for nonpayment of such taxes. And, of course, if Indian lands are not exempt from forced alienation for nonpayment of state or local property taxes, it also follows that they are not exempt from the Village's power to condemn such land for a public highway and, further, to assess such property for the cost of improvements that specially benefit the property.


## C. Express Condemnation Authority

In addition to the language of the Allotment Acts that the Court found dispositive on the issue of taxation in *Yakima* and *Cass County*, Congress expressly consented to condemnation of allotted lands without tribal consent in the 1901 Act, codified at 25 U.S.C. § 357. This Act expressly permits condemnation of ["l]ands allotted in severalty to Indians . . . for any public purpose under the laws of the State or Territory where located" even if allotted lands are still held in trust by the United States. *See Minnesota v. United States*, 305 U.S. 382, 388-89 (1939) (holding

Case 1:06-cv-01302-WCG   Filed 03/28/08   Page 22 of 47   Document 77

that action for condemnation of allotted land held in trust by United States must be brought in federal court); *Nicodemus v. Washington Water Power Company*, 264 F.2d 614, 618 (9th Cir. 1959) (holding that section 357 authorized condemnation of rights-of-way over the allotments without consent of Secretary of the Interior). More recently, the Ninth Circuit described the purpose and effect of the 1901 Act as follows:

> With respect to condemnation actions by state authorities, Congress explicitly afforded no special protection to allotted lands beyond that which land owned in fee already received under the state laws of eminent domain. See 25 U.S.C. s 357. Thus, consistent with its assimilation policy, Congress placed Indian allottees in the same position as any other private landowner vis-a-vis condemnation actions, with the interest of the United States implicated only to the extent of assuring a fair payment for the property taken and a responsible disposition of the proceeds.

*Southern Calif. Edison Co. v. Rice*, 685 F.2d 354, 356 (9th Cir. 1982).

In an effort to avoid the effect of this statute which has been found to be "clear, plain, [and] unambiguous," *Nicodemus*, 264 F.2d at 617, the Tribe argues that the 1901 Act does not apply to previously allotted land that has been reacquired by the Tribe. "By its terms," the Tribe argues, "the provision applies only to 'allotments,' not to former allotments." (Pl.'s Br. In Reply at 5.) In support of its argument, the Tribe cites *Nebraska Public Power District v. 100.95 Acres of Land*, 719 F.2d 956 (8th Cir. 1983), in which the court held that § 357 could not be used to condemn land allotted to individual Indians where, shortly before the action was filed, the Indian allottees had deeded their allotments to the United States in trust for the tribe. The Bureau of Indian Affairs, acting as the representative of the Secretary of the Interior, had filed, approved, and recorded the conveyances in accordance with its usual practice and with its regulations. *Id.* at 961. Based on this fact, the court held that the land constituted "tribal land," to which § 357 did not apply. "Tribal land," as defined in 25 C.F.R. § 169.1(d), means "means land or any interest therein, title to which

23

is held by the United States in trust for a tribe, or title to which is held by any tribe subject to Federal restrictions against alienation or encumbrance . . . ." *Id.* at 962. The Tribe contends here that its land likewise constitutes "tribal land" to which § 357 does not apply.

What the Tribe fails to recognize, however, is that title to the land at issue in this case is not held by the United States in trust for the Tribe; nor is it held by the Tribe subject to federal restrictions against alienation or encumbrance. The Tribe holds it in fee simple. Having purchased the land on the open market, the Tribe is free, subject to the limitations of its own constitution and by-laws, to sell it to whomever it chooses. Thus, the land at issue in this case is not "tribal land" as that term is defined in 25 C.F.R. § 169.1(d). But even more important from the standpoint of the Tribe in this case is the fact that the land that the state agency sought to condemn in *Nebraska Public Power* had never been withdrawn from federal protection. *Id.* at 957. Although the land in that case had been allotted in severalty to individual Indians during the allotment era, the trust period for those allotments had never expired. Recall that one of the effects of the IRA was that the existing periods of trust were extended indefinitely. 25 U.S.C. § 462. As a result, no fee-patent for the allotments had ever issued and the restrictions on alienation were never removed. That is not the case here. Fee-patents issued for all of the land that the Village seeks to condemn nearly 100 years ago, at which time "all restrictions as to the sale, taxation and alienation of the lands" were removed. 34 Stat. 325 ch. 3504. As the Supreme Court made clear in *Yakima*, *Cass County*, and *Sherrill*, once such protection is removed or, as in *Sherrill*, lost, a tribe may not unilaterally restore it by purchasing the land on the open market. *Nebraska Power* thus does not support the Tribe's contention its fee lands are exempt from state condemnation proceedings.

It would be strange indeed if, as the Tribe suggests, Congress made allotted land still under a tribe's possession and control subject to state condemnation laws, while making the same land,

24

upon issuance of a fee-patent, exempt. Review of the foregoing authority makes clear that Congress

did not do so. I therefore conclude that under the Allotment Acts, upon issuance of fee-patents by

the United States, all federal protection for the land in question, including exemption from state

laws authorizing condemnation of land for public purposes, was removed.


### D. Tribal Jurisdiction and Indian Country

The Tribe also argues, at least indirectly, that the Village's jurisdiction over its recently

acquired fee lands is limited by the fact that the Village is located within "Indian Country" as that

term is defined in Indian Country Act.[9] The term "Indian Country" is there defined as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the
> United States Government, notwithstanding the issuance of any patent, and,
> including rights-of-way running through the reservation, (b) all dependent Indian
> communities within the borders of the United States whether within the original or
> subsequently acquired territory thereof, and whether within or without the limits of
> a state, and (c) all Indian allotments, the Indian titles to which have not been
> extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Although this definition by its terms relates only to federal criminal jurisdiction,

the Court has recognized that it also generally applies to questions of civil jurisdiction. *DeCoteau

v. District County Court for Tenth Judicial Dist.*, 420 U.S. 425, 427, n. 2 (1975). The Tribe

contends, and the Village concedes, that the Tribe's fee lands constitute "Indian Country" within

---

[9] Although the Tribe refers to the undisputed fact that its fee property within the Reservation
boundaries constitutes "Indian Country" as defined by 18 U.S.C. § 1151 in its Brief in Support of
its own motion for summary judgment (Def.'s Br. In Supp. Mot. at 1, 4), its most forceful argument
as to the significance of this fact surfaces in its Brief in Response to the Village's motion when it
argues on the basis of this fact that the Village could have no "justifiable expectations" that its
power of eminent domain extends to Tribal property within the Reservation, thereby distinguishing
this case from *Sherrill*. (Pl.'s Br. In Resp. at 20-25.)

the meaning of this section. (Def.'s Br. In Supp. at 37 n. 83.) The Village's concession appears quite reasonable in light of the Court's decision in *Seymour v. Superintendent of Washington State Pennitentiary*, 368 U.S. 351, 357-58 (1962) (holding that contention that fee lands within Indian reservations do not constitute "Indian County" was "squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include 'all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent . . .'").

In any event, the Tribe views this concession as critical since the Supreme Court has noted that "[g]enerally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n. 1 (1998). In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), for example, the Court held that California's laws that sought to regulate bingo and a county ordinance that prohibited draw poker and other card games were not enforceable against the Cabazon Band of Mission Indians within its Reservation. And in *Montana v. United States*, 450 U.S. 544, 566 (1981), the Court even held that "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."

In holding that California's laws regulating bingo and a county ordinance prohibiting draw poker and similar games were unenforceable on the reservation in *Cabazon*, the Court recognized that "state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *Id.* at 207. However, the Court rejected California's argument that Congress had given

26

its express consent to that State's enforcement of gambling regulations against the Band. *Id.*

California, like Wisconsin, is one of six States that Congress has expressly granted jurisdiction over

specified areas of Indian country within its boundaries. *See* Pub. L. 280, 18 U.S.C. § 1162, 28

U.S.C. § 1360. Although Pub. L. 280 granted these States broad criminal jurisdiction over offenses

committed by or against Indians within Indian country, the Court had held in *Bryan v. Itasca*

*County*, 426 U.S. 373 (1976), that Congress' conferral of jurisdiction over civil matters was more

limited. In *Bryan*, the Court had recognized that "a grant to States of general civil regulatory power

over Indian reservations would result in the destruction of tribal institutions and values." *Cabazon*,

480 U.S. at 208 (*citing Bryan*, 426 U.S. at 387). But that had clearly not been Congress' intent. To

avoid this result, the Court had "interpreted § 4 [of Pub. L. 280] to grant States jurisdiction over

private civil litigation involving reservation Indians in state court, but not to grant general civil

regulatory authority." *Id. Cabazon* adopted the following test for determining whether Pub. L. 280

permitted enforcement of a particular state civil enactment on reservation lands: "if the intent of a

state law is generally to prohibit certain conduct, it falls within Pub. L. 280's grant of criminal

jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must

be classified as civil/regulatory and Pub. L. 280 does not authorize its enforcement on an Indian

reservation." *Id.* at 209. "The shorthand test," the Court added, "is whether the conduct at issue

violates the State's public policy." *Id.*

But *Cabazon* did not leave it at that. Even in the absence of express congressional consent

to do so, the Court recognized that "'in exceptional circumstances a State may assert jurisdiction

over the on-reservation activities of tribal members.'" *Id.* at 215 (quoting *New Mexico v. Mescalero*

*Apache Tribe*, 462 U.S. 324, 331-332 (1983)). The inquiry whether State jurisdiction is pre-empted

"is to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development." *Id.* at 216. *See also Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 478-80 (1976) (holding that state lacked power to impose personal property tax on personal property located within the reservation and owned by Indians, to impose vendor license fee on reservation Indian conducting cigarette business for the tribe on reservation land, or to collect cigarette sales taxes on reservation sales by Indians to Indians).

In light of these principles, the Tribe argues that "Amici's contention that the issuance of a patent for a former [General Allotment Act] allotment involves a 'transfer of sovereignty to state and local governments' is nonsense." (Pl.'s Br. In Response at 21 (quoting Br. of David P. Landwehr, et al. at 15)). As support for its position, the Tribe points to *Gobin v. Snohomish County*, 304 F.3d 909 (9th Cir. 2002), in which the Ninth Circuit refused to extend *Yakima*'s holding that the General Allotment Act had made repurchased Indian fee land taxable to find that such lands were also subject to local land use regulations. In *Gobin*, the County sought to enforce its zoning ordinance to prevent a tribal member from proceeding with a planned residential development on reservation land to which the tribal member held title in fee as a result of patents issued during the allotment era. The Tribe had approved the project under its zoning ordinance, but the County indicated it would reject the application, citing its interest in protecting endangered species, regulating County roads and storm sewers, providing a continuum of land use enforcement for all fee lands, and complying with applicable health and safety codes. 304 F.3d at 912, 917. The tribal member filed suit seeking a determination that the County did not have jurisdiction over her lands. The district court ruled in her favor, and the County appealed.

28

In affirming the district court's judgment, the Ninth Circuit first rejected the County's contention, based on *Yakima* and *Cass County,* that Congress had expressly authorized plenary *in rem* jurisdiction when it made the lands freely alienable.

> Congress's decision to make Indian fee lands freely alienable is not an express authorization or otherwise an "unmistakably clear" indication that the County may enforce its in rem land use regulations over those lands. Unlike the inextricably linked concepts of (forced) alienation and taxation found in County of Yakima, alienation and plenary in rem land use regulation are entirely unrelated. Thus, we hold that the right of Indians to alienate their lands freely does not provide the County with a concomitant right to exert in rem land use regulation over those lands.

304 F.3d at 916. The Court then reasoned that the County's land use regulations, especially the density requirement, operated more as a limitation upon the Indian owner's transactions and activities on the land than an encumbrance upon the land itself, and thus resembled the excise tax on sales of reservation fee lands that was struck down in *Yakima* more than the *ad valorem* property tax that was upheld. "Although tangentially related to land, they are not inextricably linked to the land itself. Thus, we hold that Congress did not expressly authorize plenary State land use regulation over Indian fee lands when it made those lands freely encumberable." *Id.* at 917. Because County's zoning ordinance restricted the on-reservation activities of tribal members without the express consent of Congress, the Court then proceeded to determine under *Cabazon* whether "exceptional circumstances" existed that were sufficient to justify such an intrusion. The Court concluded that such circumstances did not exist. Although the interests asserted by the County were important, they were "not exceptional enough to warrant interference with tribal self-government and self-determination." *Id.* at 917.

The Tribe contends that the same analysis applies here. Arguing that *Yakima* does not give the Village plenary *in rem* jurisdiction over the Tribe's reservation fee property, the Tribe proceeds

29

to challenge the Village's actions as a regulation of the Tribe's on-reservation conduct. (Tribe's Br. In Resp. at 24-25.) Because the Village's interests are "not exceptional enough to warrant interference with tribal self-government and self-determination," *Gobins*, 304 F.3d at 917, and based on *Montana* and *Moe*, the Tribe argues that the Village cannot impose its development plans on land within Indian Country. The Tribe thus argues that the Village cannot use its statutory power of eminent domain to condemn tribal property in furtherance of those plans. (Pl.'s Resp. Br. at 20-25.)

While *Gobin* does provide some support for the Tribe's position, I conclude that the Supreme Court has already rejected this argument in *Yakima*. In *Yakima* the Court explicitly distinguished between jurisdiction over the land (*in rem*), which it found that County had by virtue of the General Allotment Act's removal of all restrictions on the land's alienability, and jurisdiction over the person (*in personam*), over which it held that the Allotment Acts had no effect. 502 U.S. at 264-65. The Court concluded that the County had *in rem* jurisdiction to tax the allotted fee land but it did not have *in personam* jurisdiction to tax a tribal member on the proceeds of a sale of the land. *Id.* at 266-69. In so ruling, the Court expressly adopted a categorical approach and rejected that portion of the Court of Appeals' decision remanding the case to the district court with directions to make findings concerning the Yakima Tribe's "'protectible interest' against imposition of the tax upon its members . . . ." *Id.* at 266. In other words, *Yakima* rejected the tribal regulatory authority line of cases on which the Tribe relies, as having no application where Congress had already performed the balancing of interests those cases envisioned. *Id.* at 267; *see also Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*, 492 U.S. 408 (1989) (Stevens, J., concurring) (noting that "to the extent that large portions of reservation land were sold in fee, such

30

that the Tribe could no longer determine the essential character of the region by setting conditions on entry to those parcels, the Tribe's legitimate interest in land-use regulation was also diminished").

The Court's more recent decision in *Sherrill* also calls into question the Ninth Circuit's holding in *Gobin*. There, in support of its conclusion that the OIN could not restore its sovereignty over its reservation land through open-market purchases, the Court noted "[i]f OIN may unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little would prevent the Tribe from initiating a new generation of litigation to free the parcels from local zoning or other regulatory controls that protect all landowners in the area." 544 U.S. at 220. Those were precisely the concerns that led the Court to conclude that Congress intended § 465 as "the proper avenue for OIN to reestablish sovereign authority over territory last held by the Oneidas 200 years ago." *Id.* at 221. The same concerns are present here.

I thus conclude that the fact that the land at issue is "Indian Country" within the meaning of 18 U.S.C. § 1151 does not change the outcome. "Condemnation proceedings are *in rem*," *United States v. Petty Motor Co.*, 327 U.S. 372, 376 (1946), as is the procedure for imposing a special assessment. Wis. Stat. § 66.0703(1)(a). *Yakima* holds that the property's exemption from such *in rem* proceedings was terminated by Congress through the Allotment Acts. Absent a Congressional enactment to the contrary, the Village may proceed under its statutory authority with its project.

**E. Section 16, 25 U.S.C. § 476(e), of the IRA**

In *Cass County* the Court recognized that Congress can change the result of the Allotment Acts through another "unmistakably clear statement." *Cass County*, 524 U.S. at 114. Notwithstanding the Court's clear holding in *Yakima* and *Cass County* that the IRA did not change

31

the status of fee-patented allotments, the Tribe claims that Congress did just that in its enactment of Section 16 of the IRA, 25 U.S.C. § 463, a provision apparently not even asserted in those cases. That section, the Tribe argues, demonstrates Congress' intent that land reacquired by a tribe not be disposed of without the tribe's consent.

Section 16 of the IRA governs the organization of Indian tribes. Subsection (e), entitled "vested rights and powers," states:

> In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel; *to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe;* and to negotiate with the Federal, State, and local governments.

25 U.S.C. § 476(e) (italics added). The Tribe contends that § 476(e) "grants an IRA tribe such as the Oneida Tribe a veto power over any disposition of tribal assets, including dispositions resulting from condemnation." (Pl.'s Br. Supp. Summ. J. at 7.) This "veto power," the Tribe argues, was expressly confirmed by Congress in 1948 when it passed the Act of Feb. 5, 1948, 62 Stat. 17 (the "1948 Act"), which, *inter alia*, provides that "[n]o grant of a right-of-way over and across any lands belonging to a tribe organized under the [IRA] . . . shall be made without the consent of the proper tribal officials." 25 U.S.C. § 324. Based on the plain language of § 476(e), as confirmed by the 1948 Act, the Tribe argues that no disposition of its property, including by condemnation, can occur without its consent. Because it has not consented to the Village's proposed condemnation of its land, the Tribe argues that the condemnation is invalid under the IRA. (*Id*. at 7-8.)

32

Neither § 476(e), nor the 1948 Act, considered in context, support the Tribe's contention that the IRA gives tribes an absolute veto power over state condemnation proceedings. Section 16, as part of the overall goal of reinvigorating the tribes after federal Indian policy shifted away from assimilation and allotment, empowered tribes to organize and adopt constitutions, subject to ratification by majority vote of the tribal members and approval by the Secretary of the Interior.[10] Subsection (e) enumerates several of the rights and powers that the new tribal constitutions could vest in the tribe or its tribal council. Among these is the power "to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe." 25 U.S.C. § 476(e). But by authorizing tribes to form their own governments and adopt constitutions, the IRA did not resurrect federal protection over lands that had previously been transferred in fee.

By its own terms, the IRA was to have no affect on the "valid rights or claims of any persons to any lands" already withdrawn from federal protection. 25 U.S.C. § 463(a). Here, there is no dispute that all of the land at issue was sold in fee and thereby withdrawn from federal protection long before enactment of the IRA. Federal protection of such lands had thus already been extinguished and was not affected by the IRA. As the *Yakima* Court observed, Congress "chose *not* to return allotted land to pre-General Allotment Act status, leaving it fully alienable by the allottees, their heirs, and assigns." 502 U.S. at 264. Instead, Congress included in the IRA "a mechanism for the acquisition of lands for tribal communities that takes account of the interests of others with stakes in the area's governance and well-being." *Sherrill*, 544 U.S. at 220. Acceptance of the

---

[10] *Cohen* at 252.

33

Tribe's interpretation of Section 16, no less than acceptance of the Leech Lake Band of Chippewa's argument for exemption from taxation in *Cass County*, would render that procedure (25 U.S.C. § 465) at least "partially superfluous." 524 U.S. at 114. Furthermore, as the Village observes, the Tribe's interpretation of Section 16 proves too much. (Village's Br. In Reply at 17.) If any encumbrance of tribal fee lands requires tribal consent, then the imposition of an *ad valorem* property tax on such lands, expressly upheld by the Court in *Yakima* and *Cass County*, would require tribal consent. The Tribe's interpretation of the IRA simply cannot be reconciled with those cases.

It is true that shortly after passage of the IRA, the Tribe did, with the Secretary's approval, adopt a constitution that vested in its Tribal Council the powers listed in § 476(e). Article IV, Section 1 of the Tribe's Constitution provides:

> **Enumerated Powers.** – The General Tribal Council of the Oneida Tribe of Wisconsin shall exercise the following powers, subject to any limitations imposed by the statutes or the Constitution of the United States:
>
> ****
>
> (c) to veto any sale, disposition, lease or encumbrance of tribal lands, interests in lands, or other tribal assets of the tribe.

(Aff. of Vice Chairwoman Kathy Hughes, Ex. A.) This provision makes clear that only the General Tribal Council is authorized to convey tribal property on behalf of the tribe. But it says nothing about whether the Village needs the Tribe's consent before it can lawfully tax or condemn the Tribe's fee lands within its boundaries. The nature of a constitution is that it sets forth only the rights and powers of the government that it establishes over those who are subject to it. The Tribe's

34

constitution can no more limit the power of the Village to exercise its lawful authority to condemn property within its borders for highway purposes than the Village charter can limit the Tribe's exercise of its own lawful authority.

Interpreting the Tribe's Constitution as a limit only on the authority of those supposedly acting on behalf of the Tribe to convey, encumber or otherwise dispose of tribal property is consistent not only with the nature of a constitution or charter, but also the legislative history of Section 16 of the IRA. Representative Howard, a chief sponsor of the bill in the House, offered the following explanation of the provision in question:

> Among the most important powers conferred by this section is that which would prevent the sale, disposition, lease, or encumbrance of tribal lands or assets without the consent of the tribe. Under existing law, tribal moneys may be appropriated for the expenses of the Indian Service. It has been estimated that since 1900 the Government has spent $500,000,000 of tribal money in per capita payments and administrative costs. Much of this money has gone to pay for routine activities of the Indian Service over which the Indians have exercised no control whatever, much has been spent for ill-advised irrigation projects which have benefited [sic] the whites rather than the Indians, without the consent of the tribe.
>
> The Indians should unquestionably have a voice in the spending of their own money. The present system is in effect a totally indefensible system of "taxation without representation" and has led to the profligate and unproductive expenditure of vast sums of money. Most of this huge expenditure represented Indian capital, derived either from the sale of land or other assets or from claims arising out of Government mismanagement of Indian property. It should be axiomatic that no Indian capital should be spent for any purpose except productive development of Indian property or enterprise. The expenditure of these vast sums of capital for routine administration or for per capita doles should be stopped. The bill would give the Indians a veto power over such expenditures.

78 Cong. Rec. 11,731 (1934). John Collier, Commissioner of Indian Affairs, likewise explained that the purpose of Section 16 was to prevent the federal government from disposing of tribal assets without consulting the tribe for whose benefit the disposition was supposedly made. In testimony

35

before the House Committee on Indian Affairs, he noted that "under existing law, in any one case, the Secretary of the Interior can rent, lease, or alienate tribal assets; under this new section that power would be taken away from him and would make all disposal subject to tribal consent." *Readjustment of Indian Affairs: Hearings on H.R. 7902 Before the Committee on Indian Affairs*, 73rd Cong. 189 (1934). This testimony confirms that Congress' intent in enacting Section 16 was to prevent the use of tribal resources by government bureaucrats for the tribe's purported benefit; it was not to provide tribes with an alternative means of resurrecting the exemption from state laws their reacquired lands had previously enjoyed.

All but one of the handful of cases that have had occasion to address § 476(e) have rejected the broad interpretation of that provision that the Tribe advances. In *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973), for example, the Court rejected a broad interpretation of § 476(e) in upholding the imposition of a state tax on the gross receipts of a ski resort operated by the Mescaleros on land located outside the boundaries of their reservation. Noting that Section 16 of the IRA was "designed to encourage tribal enterprises to enter the white world on a footing of equal competition," the court refused to imply an expansive immunity from ordinary income taxes to which businesses throughout the State were subject. *Id.* at 157. In *Fort Mojave Tribe v. San Bernardino County*, 543 F.2d 1253 (9th Cir. 1976), the court likewise rejected the claim that Section 16 of the IRA, 25 U.S.C. § 476, barred the County's imposition of a possessory interest tax on non-Indian lessees of land held in trust by government for the Fort Mojave Indian Tribe, finding that the Tribe's argument exceeded "the expressed Congressional intent in enacting the Act to further the achievement of economic independence for the Indians and the establishment of effective systems of tribal self-government." *Id.* at 1256. And in *United States v. Anderson*, 625 F.2d 910

36

(9th Cir. 1980), the court rejected an Indian's claim that income he derived from cattle ranching under a tribal license on land held in trust by the United States for other Indians was exempt from federal taxation. Although the court held that § 476 did not apply, it concluded that it would not help even if it did because the word "encumbrance," as used § 476(e), "refers only to a tribe's power to prevent the unconsented encumbrance of its land interests by removing from its agents and members the legal authority to alienate or cloud, without official tribal consent, its equitable title to its trust land." *Id.* at 916.

Only one court has read § 476(e) as a limitation on a municipality's lawful authority over a tribe's fee land located within its boundaries. In *Matter of Delinquent Taxes Owed City of Nome, Alaska*, 780 P.2d 363 (Alaska 1989), the Alaska Supreme Court held that an action brought by the City of Nome to foreclose on two tracts of commercial property for nonpayment of taxes was barred by §476(e) because the tribe that owned the property had not consented to the action. The case is unpersuasive, however, because the property involved had not previously been allotted, but was purchased in part with funds from a specific federal grant program. More importantly, the basic holding of the case was overturned by the United States Supreme Court several years later in *Yakima*, and again in *Cass County*, when it held that tribal fee lands were subject to local taxation.

Also unpersuasive is the Tribe's argument that its interpretation of Section 16 of the IRA is confirmed by the 1948 Act, 25 U.S.C. § 324, which authorizes acquisition of a right-of-way over tribal lands upon consent of tribal officials. This argument fails, first, because as noted above in the discussion of the 1901 Act, governing condemnation on allotted lands, 25 U.S.C. § 353, the land at issue in this case is not "tribal land" as that term is defined in the applicable regulation. *See* 25 C.F.R. § 169.1(d). Thus, the 1948 Act does not even apply to the land at issue.

The Tribe's argument fails on a more fundamental level, however, because the purpose of the 1948 Act was not, as the Tribe suggests, to limit the ability of states, local governments or utilities to obtain right-of-ways, but, instead, to make it easier to obtain them. Condemnation involves the taking of private property in the exercise of a government's power of eminent domain. To exercise this "extraordinary power" the condemnor is required to fully comply with a procedure set out by statutes that are strictly construed in favor of the owner whose property is taken against his or her will. *Matter of Redevelopment Authority of Green Bay*, 355 N.W.2d 240, 244 (Wis. 1984); Wis. Stat. ch. 32. The 1948 Act, on the other hand, governs the voluntary "grant of a right-of-way," 25 U.S.C. § 324, as opposed to the taking of an easement. *Compare* 25 U.S.C. § 357 (providing for condemnation of lands under state laws). "The purpose of the 1948 Act was to simplify and facilitate this process of granting rights-of-way across Indian lands." *Nebraska Public Power District v. 100.95 Acres of Land*, 719 F.2d at 959. It accomplished this goal by clarifying who was authorized to grant such rights-of-way, so that state or local governments, or their agents, could obtain the necessary easements voluntarily from the affected landowners instead of using the more cumbersome condemnation procedure authorized by the 1901 Act, 25 U.S.C. § 357.

Thus, the 1948 Act does not confirm the Tribe's argument that Section 16 of the IRA was intended to restore tribal sovereignty over reacquired lands. It does not even reduce the authority of state or local governments, granted under the 1901 Act, 25 U.S.C. § 357, to condemn allotted land still held in trust. Instead, as the Eighth Circuit held in *Nebraska Power District,* the 1948 Act, also known as the Indian Right-of-Way Act of 1948, 25 U.S.C. §§ 323-28, provides an alternative and less formal way of acquiring rights-of-way over tribal lands than the 1901 Act. 719 F.2d at 960. Two other Circuits have reached the same conclusion. In *Nicodemus v. Washington Water Power*

Case 1:06-cv-01302-WCG   Filed 03/28/08   Page 38 of 47   Document 77

*Co.*, the Ninth Circuit held that "Section 323 and Section 357 offer two methods for the acquisition of an easement across allotted Indian land for the construction of an electric transmission line." 264 F.2d at 618. And the Tenth Circuit held likewise in *Yellowfish v. City of Stillwater*, 691 F.2d 926, 930 (10th Cir. 1982), cert. denied, 461 U.S. 927 (1983) ("The two statutes provide alternative methods for a state-authorized condemnor to obtain a right-of-way over allotted lands.").

In short, the 1948 Act does not confirm the Tribe's interpretation of Section 16 of the IRA, 25 U.S.C. § 476(e). Neither that Act, nor Section 16 itself, supports the Tribe's contention that in enacting the IRA, Congress restored tribal power by granting tribe's a veto power over the statutory authority of state or local governments to condemn reacquired fee lands within their boundaries. The Tribe's claim under the IRA will therefore be dismissed.

**F. The Indian Nonintercourse Act**

The Tribe also claims that the condemnation of its fee land is precluded by the Indian Nonintercourse Act (INA), which states in pertinent part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. Dating back to 1790, the purpose of the INA was "to prevent unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties, except the United States, without the consent of Congress, and to enable the Government, acting as parens patriae for the Indians, to vacate any disposition of their lands made without its consent." *Federal*

39

*Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). The Tribe argues that the INA precludes condemnation of the land at issue, absent Congress' consent, because it applies to any conveyance of land by a tribe, regardless of how the land was acquired. (*Id*. at 15; Tribe's Br. in Reply 9-10.) Because Congress has not given its consent to the Village's proposed condemnation, the Tribe argues it cannot proceed.

As an initial matter, it is less than clear that the INA applies to condemnation proceedings. The Act prohibits the "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto from any Indian nation or tribe of Indians" without the consent of Congress. These terms suggest a voluntary transfer of property or interest therein. *See Black's Law Dictionary* (7th ed.) at 334 (defining conveyance as "the voluntary transfer of a right or property.") Condemnation is a taking of property, not a voluntary transfer. Although just compensation must be paid, condemnation is not, in the normal sense of the word, a "purchase, grant, lease, or other conveyance of lands." *But see Tuscarora Indian Nation v. Federal Power Commission*, 265 F.2d 338 (D.C. Cir. 1958) (applying INA to condemnation proceeding), *rev'd on other grounds*, 362 U.S. 99 (1960).

It is also questionable whether the INA applies to tribal fee lands purchased on the open market, as opposed to tribal lands the possession of which is based upon aboriginal occupancy. The First Circuit has observed that the INA was enacted before the allotment era when "Congress did not distinguish between Indian trust lands and Indian fee lands at this time presumably because it did not contemplate that Indian tribes could hold land in fee simple." *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 549 (1st Cir. 1997). It is true, of course, that statutes passed for the benefit of dependent Indian tribes are to be liberally construed with doubtful expressions being resolved in favor of the Indians. *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976). But the Court

40

has also recognized that "legislation dealing with Indian affairs 'cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted [it].'" *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 666 (1979) (quoting *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206 (1978)).

In *Mashpee Tribe v. Watt*, the court observed that "the major purpose of the Nonintercourse Act was to prevent Indian uprisings and preserve the peace along the frontier." 542 F. Supp. 797, 803 (D. Mass. 1982), *judgment aff'd*, 707 F.2d 23 (1st Cir. 1983). This was to be accomplished by (1) protecting the rights of Indians to their properties through acknowledging and guaranteeing the Indian tribes' right to occupy their aboriginal lands; and (2) by preventing the Indians from improvidently disposing of their lands at fraudulently low prices. *Id.* Noting that "[t]his purpose would in no way be served by restricting the alienation of property acquired by Indians from non-Indians in settled sections of the country," the court concluded that the INA "imposed restrictions only on the alienation of land held under aboriginal title." *Id.* Since the land here at issue is not held under aboriginal title, it is questionable whether the INA even applies.

I need not determine, however, whether the INA otherwise applies to condemnation of tribal fee lands purchased on the open market. Even if the INA does apply, it necessarily follows from what has already been said that the Tribe's claim under the Indian Nonintercourse Act in this case must fail. To see this, we need only consider the elements of a claim under the INA. An essential element of a claim under that Act is proof that "the United States never consented to or approved the alienation of this tribal land." *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 56 (2nd Cir. 1994); accord: *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 418 (3rd Cir. 2006). Yet, the clear import of *Yakima* and *Cass County* is that the consent of Congress which the INA

41

requires for "the extinguishment of Indian title," *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 240 (1985), was provided by the Allotment Acts upon issuance of the patent conveying the allotment in fee simple, free of "all restrictions as to sale, incumbrance, or taxation of said land." 25 U.S.C. § 349. And as the Court further held in *Sherrill*, a case in which the INA is explicitly cited (though not applied), 544 U.S. at 204, a tribe "cannot unilaterally revive its ancient sovereignty" over its lands "through open-market purchases from current titleholders." *Sherrill*, *Id.* at 203.

Though the Supreme Court found it unnecessary to decide this issue in *Cass County*, 524 U.S. at 115 n.5, the Ninth Circuit reached this conclusion in *Lummi Indian Tribe v. Whatcom County*, where it noted that "[n]o court has held that Indian land approved for alienation by the federal government and then reacquired by a tribe again becomes inalienable. To the contrary, courts have said that once Congress removes restraints on alienation of land, the protections of the Nonintercourse Act no longer apply." 5 F.3d 1355, 1359 (9th Cir. 1993) (citations omitted). Other courts have agreed. *See Anderson & Middleton Lumber Co. v. Quinault Indian Nation*, 929 P.2d 379, 387-88 (Wash. 1996) ("Reacquisition of the land by the Nation does not change this result since 'parcels of [Indian] land approved for alienation by the federal government and then reacquired by the Tribe [do] not then become inalienable by operation of the Nonintercourse Act.'") (quoting *Lummi*, 5 F.3d at 1359); *Bay Mills Indian Community v. Michigan*, 626 N.W.2d 169, 174 (Mich. App. 2001) (same); *Cass County Joint Water Res. Dist. v. 1.43 Acres of Land*, 643 N.W.2d 685, 697 (N.D. 2002) (same).

While the Tribe strongly criticizes the holding in *Lummi* and dismisses the cases that follow its lead, it fails to cite one case in support of its own contention that reservation lands lawfully

42

conveyed in fee upon issuance of a patent issued by the United States pursuant to the Allotment Acts regain federal protection from taxation and alienation merely upon reacquisition by the tribe. The cases it does cite are readily distinguished. In *Federal Power Commission v. Tuscarora Indian Nation*, for example, the Tribe notes that the D.C. Circuit found the INA applicable to land held by a tribe in fee simple, stating "[i]t makes no difference how title to the land may have been acquired by the tribe." 265 F.2d at 339. But it does seem to make a difference when it was acquired. In *Tuscarora Indian Nation*, the land at issue was purchased in 1804 under the auspices of the United States with money derived from the sale of the displaced tribe's North Carolina property and was now part of the tribe's New York reservation. 265 F.2d at 150; *see also Tuscarora Nation of Indians v. Power Authority of State of N Y*, 257 F.2d 885, 887 (2nd Cir. 1958), *cert. denied*, 358 U.S. 841 (1958), *vacated as moot sub nom. McMorran v. Tuscarora Nation of Indians*, 362 U.S. 608 (1960). Unlike the property at issue here, no fee patent had ever issued for the land pursuant to an allotment act. This very distinction was noted by the Second Circuit in discussing "whether in delegating its power of condemnation to the Power Authority, Congress expressly or impliedly intended to authorize the taking of Indian Reservation or tribal lands (as distinct from lands allotted to Indians in severalty, 25 U.S.C.A. § 357) . . . ." 257 F.2d at 893.

Likewise, in *United States v. 7405.3 Acres of Land*, the land at issue had been purchased for a displaced tribe in the 1800s and conveyed in trust to the United States for the benefit of the tribe. 97 F.2d 417, 422 (4th Cir. 1938). Both *United States v. Candelaria*, 271 U.S. 432, 442 (1926), and *Alonzo v. United States*, 249 F.2d 189, 196 (10th Cir. 1957), also relied upon by the Tribe, involved land held by Pueblo Indians in fee simple under both Spanish and Mexican law before the United States gained control over New Mexico. Because the lands at issue in those cases were not subject

43

to the Allotment Acts, and given the unique history of the Pueblo and the special legislation Congress enacted to address that tribe, *see United States v. Sandoval*, 231 U.S. 28, 45-48 (1913), those cases provide little guidance on the issue raised here.[11]

It is true that in the two cases remanded to the United States District Court for the Northern District of New York after the Supreme Court's decision in *Sherrill*, the lower court has now held that recently purchased tribal lands are subject to the INA. On remand, the district court concluded that the local governments, whose authority to tax the OIN's property was upheld by the Supreme Court, are nevertheless barred by the INA from foreclosing on the property for nonpayment of taxes. *See Oneida Indian Nation v. Madison County*, 401 F. Supp. 2d at 227-230; *Oneida Indian Nation v. Oneida County*, 432 F. Supp. 2d at 289. As already noted, I find the right of a local government to foreclose for nonpayment of taxes implicit in *Sherrill*'s holding that the OIN's reacquired property is subject to *ad valorem* property taxes and therefore disagree with the district court's decision in those cases. But even if the authority to foreclose for nonpayment of property taxes is not implicit in the authority to impose the property tax in the first place, the *Oneida Indian Nation* cases are nevertheless distinguishable from this case in that Congress never consented to the removal of federal protection of the property there at issue. The State of New York had acquired the lands unlawfully. *Sherrill*, 544 U.S. at 205.

Indeed, none of the cases cited by the Tribe in support of its argument that the Village's proposed condemnation is barred by the INA involved land that was subject to a congressional

---

[11] As the *Amici* supporting the Village's position note (Br. of Landwehr, et al. at 20-21 n.16), not only have the cases cited by the Tribe been distinguished on this basis, but the analyses of several have been criticized for their "paucity of analysis and outdated paternalism." *Penobscot Indian Nation*, 112 F.3d at 553 n.18.

enactment removing all restraints on taxation and alienation. The effect of the Allotment Acts was not addressed, since none of the land in those cases was subject to those Acts. I thus find the cases cited by the Tribe inapposite to the specific issue raised here.

Given the clear manifestation of Congress' consent to the alienation of the land at issue in the Allotment Acts, I conclude that any federal restraint on state condemnation of such land was lawfully removed. It therefore follows that the INA does not bar the Village's planned condemnation of that portion of the land needed for the planned road extension.

## G. The Tribe's Claim for Return of Special Assessments

Lastly, the Tribe has asserted several state law claims for the return of the special assessments it has already paid the Village under protest. These claims are, for the most part, predicated on the Tribe's claim that "because federal law precludes condemnation of the Tribe's property, the Village cannot impose the special assessments that are at issue to pay for the O'Hare Boulevard extension." (Pl.'s Br. In Supp. at 2.) Thus, the Tribe claims that the Village's collection of the assessments constitutes unjust enrichment and conversion of Tribal property. (Compl., Counts VI and VII.) The Tribe also claims that the Village has violated state law in imposing and retaining the assessments on its property. Specifically, the Tribe alleges that the Village's assessment of its property is in violation of Wis. Stat. §§ 66.703(1)(c), which requires that the Village pay the assessment "[i]f any property that is benefited [sic] is by law exempt from assessment." Based on its claim that its property is exempt, the Tribe claims the Village violated § 66.073(1)(c) in assessing it for the cost of the improvements. (Compl. ¶¶ 72, 74.) The Tribe also

45

alleges that the Village violated § 66.0703(11), which requires the governing body to return any assessment paid that is in excess of the cost of the improvements. Since the Village has not yet incurred any costs on the planned improvements, the Tribe claims it is entitled to the return of the assessments it previously paid. (Compl. ¶ 73.)

To the extent they are based on the Tribe's contention that the property it recently purchased in fee on the open market is exempt from assessment based on federal law or tribal sovereignty, the Tribe's state law claims for the return of the assessments already paid must be dismissed for the reasons stated above. To the extent the claims are based on the allegations that the Village failed to comply with state law in imposing the assessment, the Village's evidence to the contrary is undisputed (VPFOF ¶¶ 43-45, 49), as is the fact that the Tribe failed to appeal the assessment as it was entitled to do under Wis. Stat. § 66.073(12). (VPFOF ¶ 57.) Accordingly, the Tribe's state law claims seeking recovery of the special assessments it has already paid will also be dismissed. However, dismissal of the Tribe's claim under Wis. Stat. § 66.073(11) will be without prejudice. Since the project has been delayed due to the uncertainty over the Village's authority to proceed with the project, the final costs of the project has not been determined, and so any claim under that section for the return of excess payments would be premature.

**CONCLUSION**

For the reasons set forth above, I conclude that fee land within the original boundaries of the Tribe's reservation which was allotted pursuant to federal law, transferred to third parties, and subsequently acquired by the Tribe in fee simple on the open market, is subject to the Village's

46

power of eminent domain.  In addition, I conclude that the land is subject to special assessments levied against the property for improvements that specially benefit it.  The Tribe's motion for partial summary judgment is therefore denied, and the Village's motion for summary judgment is granted.  The clerk is directed to enter final judgment in the favor of the Village setting forth the court's determination that the Village of Hobart has condemnation, special assessment and taxation authority over lands purchased in fee by the Oneida Tribe of Indians of Wisconsin, in accordance with Wisconsin law, unless and until the Tribe's application to place such land in trust pursuant to 25 U.S.C. § 465 is granted.  All other claims are dismissed with prejudice, with the exception of the Tribe's claim under Wis. Stat. 66.0703(11), which is dismissed without prejudice.

     **SO ORDERED** this ____28th____ day of March, 2008.


                     s/ William C. Griesbach_____
                    William C. Griesbach
                    U.S. District Judge